In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00513-CV

_____

IN THE INTEREST OF G.R. AND T.R.

On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 13-10-10830 CV

**MEMORANDUM OPINION**

Appellant (the Father) appeals the trial court's order terminating his parental rights to G.R. and T.R.[1] The Father raises four issues on appeal. In his first three issues, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding that he violated subsections (D), (E), and (O) of section 161.001(1) of the Family Code. In his fourth issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding that

---

[1]To protect the identity of the minors, we have not used the names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

1

termination was in the children's best interest. We affirm the trial court's judgment.[2]

## Burden of Proof and Standards of Review

Parental rights can be terminated upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Family Code, and termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1), (2) (West 2014); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014). This is an intermediate standard and falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re D.T.*, 34 S.W.3d 625, 630

---

[2]G.R. and T.R.'s mother (the Mother) signed an affidavit voluntarily relinquishing her rights to G.R. and T.R. The trial court accepted the Mother's affidavit and terminated the Mother's parental rights to G.R. and T.R. The Mother has not appealed that determination.

(Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g). Therefore, the proof must be more than merely the greater weight of the credible evidence, but need not be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. This heightened burden of proof results in a heightened standard of review. *In re J.F.C.*, 96 S.W.3d at 265-66.

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence in a parental termination case, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the

3

disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## Factual and Procedural Background

The Department of Family and Protective Services (the Department) first became involved in this case when it received multiple allegations of sexual abuse and drug abuse in the home of G.R. and T.R. At the time of trial, G.R. was six years old and T.R. was four years old. In response to the allegations, Child Protective Services (CPS) assigned Crystal Houts to investigate the allegations. Houts testified that G.R. reported observing domestic violence between the Mother and the Father—G.R. recalled seeing the Father throw the Mother down a flight of stairs.

Houts' investigation resulted in a finding that CPS had reason to believe the Mother had engaged in physical abuse and neglectful supervision. Because Houts

4

believed G.R. and T.R. were in conditions that endangered them, she removed them from the Mother's home.

Houts also investigated an allegation that the Father had sexually abused the Father's stepdaughter, I.K. Houts was unable to locate the Father during her investigation to speak to him about this allegation. Houts testified that her investigation led her to believe that I.K. made a valid outcry of sexual abuse against the Father, describing vaginal penetration. However, based on the information available during her investigation and the fact that she had been unable to locate and speak to the Father, the Department ultimately found it was unable to determine whether sexual abuse had actually occurred.

Houts testified that she found the Mother to be very inconsistent in her reporting to the Department. Houts explained that she spoke to the Mother several times about whether the Mother believed the Father hurt I.K., and the Mother provided multiple different responses. Notwithstanding the Mother's apparent dishonesty, Houts testified that Houts believed I.K.'s outcry to be credible. Houts testified there remains an ongoing criminal investigation of the Father concerning his alleged sexual abuse of I.K.

The Mother testified that she and the Father separated in December of 2012 when the Father became intoxicated and tried to wrap his hands around her neck

and kill her. The Mother testified that there had been other incidents of domestic violence. The Mother testified that the Father not only abused her, but also physically abused the children. She testified she came home multiple times to find bruises on the children. She testified that the Father was a "spanker" and would use his hands, a belt, a shoe, or anything else he could get his hands on to spank the children. The Mother was of the opinion that the Father would continue this behavior if he were granted custody of them. The Mother denied that she personally used corporal punishment on the children, denied that she assaulted the Father, and denied that she had a bad temper. When questioned about bruising that appeared on the children after the Father had left the home, the Mother testified that her babysitter had caused those bruises. The Mother did not let the Father see the children from December 23, 2012 to the time CPS removed G.R. and T.R. from her on October 7, 2013.

The Mother admitted to taking pills while caring for the children and testified that the Father also knew she was taking pills. The Mother testified that while she was struggling with drug abuse, the children were in a dangerous environment. According to the Mother, the Father never tried to remove the children from her because of her drug problem.

The Mother testified that the Father drank one or two beers a night and smoked marijuana daily. According to the Mother, the Father has driven under the influence many times with the children in the car. She explained that the Father smoked marijuana throughout the day, so there was rarely a time when he was not "stoned." The Mother testified that the Father smoked marijuana even when he was in charge of taking care of the children. The Mother was of the opinion that the Father endangered the children.

The Mother testified that the Father did not maintain stable employment while they were married. It was her opinion that if the court returns G.R. and T.R. to the Father, he would not meet their physical and emotional needs.

According to the Mother, more than nine months after she separated from the Father, I.K. told the Mother that the Father had sexually abused I.K. The Mother testified that I.K. told her that the Father had warned I.K. not to tell anyone about the abuse or the Father would kill the Mother and the other children. The Mother testified that I.K. acted out sexually towards her younger siblings due to the abuse she had endured from the Father. The Mother testified that she accused the Father of sexually molesting her daughter, I.K., because I.K. told her it had happened and she found I.K.'s statements credible. The Mother felt that it would be in G.R. and T.R.'s best interest to terminate the Father's parental rights.

I.K.'s biological father testified that he observed I.K. acting out sexually towards other children. He testified that I.K.'s schoolteacher had also observed her acting out sexually at school and had called CPS. According to I.K.'s biological father, when he asked I.K. why she was doing these things, I.K. told him that the Father had inappropriately touched her.

The CPS caseworker assigned to G.R. and T.R. testified that she prepared a service plan for the Father. When she prepared the plan in mid-October or November, the Father was not available to the Department and he did not resurface until February or March of 2014. She testified that when the Father did show up, she went over the service plan with him and he appeared to understand the plan's requirements. She testified that she reviewed the plan with him and asked for his input and gave him an opportunity to add to the plan or take items away from the plan.

The caseworker testified that the Father participated in some services but did not complete the service plan. She explained that the Father submitted himself for and received a drug and alcohol assessment. The assessment indicated that the Father needed to attend alcohol and drug education courses. The caseworker was concerned because the assessment also indicated that the evaluator believed the

Father did not appear truthful during the assessment and appeared to minimize his drug and alcohol use.

According to the caseworker, the Father exercised his visits with the children throughout the case, but did not complete his counseling requirements successfully. The Father failed to complete the service plan requirement regarding his alleged sexual offense, he did not participate in the required sex offender group class, and he did not go to the parenting collaboration group.

The caseworker testified that she was concerned about placing the children with the Father because the Father's current girlfriend tested positive for marijuana use. While the Father took eight drug tests for the Department in the nine months prior to trial and tested negative for drug use on each occasion, the caseworker explained that the Father missed taking half of the required tests.

Regarding the allegation of sexual abuse, the caseworker acknowledged that the children's former caseworker indicated in a sworn affidavit that the Mother told her that I.K. never told the Mother she had been sexually abused by the Father, that the Mother did not believe that I.K. had been sexually abused, and that the Mother believed I.K. had been coached. The caseworker recommended that the court terminate the Father's parental rights.

9

The CASA advocate for the children also recommended that the court terminate the Father's parental rights to G.R. and T.R. She explained her concerns that the Father failed to complete all of the items on his service plan. The CASA advocate testified that she believes terminating the Father's rights would be in G.R. and T.R.'s best interest. She based her opinion not only on I.K.'s credible outcry of sexual abuse against the Father but also on the documented history of the Father's physical abuse against G.R. and T.R.

The foster mother testified that when G.R. and T.R. first came into her home they struggled with hyperactivity and anger problems. She testified that after the children visited with the Mother or the Father, their behavioral issues intensified. After visiting with the Father, G.R. came home terrified that the Father was going to take G.R. away. She testified that both children seemed to be "really scared" of the Father.

The foster mother also fosters I.K. The foster mother testified that she has no doubt that the Father sexually abused I.K because I.K. demonstrates characteristics of having been sexually abused. The foster mother testified in detail regarding I.K.'s outcry statement to her that she had been sexually abused by the Father. She also testified that I.K. has acted out sexually at school towards other students. In

her opinion, I.K. was scared of the Father and had told her that the Father had hit her very hard.

One provision of the Father's service plan ordered him to attend counseling sessions with Victor Love, a licensed marriage and family therapist. The Father had his first session with Love on March 26, 2014, and he attended counseling with Love approximately twice a month until trial in October 2014. Love testified that he did not believe the Father progressed therapeutically regarding his stepdaughter's allegations of sexual abuse. Love spoke to the Father about the services the Department required the Father to complete relative to the sexual abuse, including the requirement that the Father undergo a psychosexual assessment, attend Arena Counseling, and submit to Dr. Walter Quijano for sexual abuse and sexual offending treatment. Love testified that he spoke with the Father about the recommendation from the psychosexual evaluation that the Father participate in a boundaries class. Love testified that the Father ultimately did not participate in the class. Love recalled that the Father told him that he did not want to participate in the class because the Father believed participation in the class was an admission of guilt to the alleged offense. Love explained to the Father several times that it was just a psychoeducational class and that he would not be required to admit to any kind of sexual offense. He explained to the Father that the class

11

would teach him about sexual abuse issues and the proper boundaries in a parent-child relationship. Love testified that he believed the Father needed to attend the class and he told the Father several times that the Father would benefit from attending the class. According to Love, while the Father attended counseling sessions with Love, the Father was not cooperative during the sessions and did not appear open to learning anything.

Love testified that he relied on the psychological evaluation of the Father performed by Dr. Jenny Stadler. In evaluating the Father's child abuse potential, Stadler found that the Father had an elevated lie scale that caused her concern. An elevated lie scale result reflects Stadler's assessment that the Father attempted to make himself look better during the evaluation, thereby undermining the credibility of the answers he provided. According to Love, Stadler assessed that the Father "had poor knowledge of parenting information with respect to using corporal punishment rather than non-corporal punishment methods of parenting." Stadler diagnosed the Father as having an unspecified personality disorder to include some histrionic and narcissistic personality traits. Love found Stadler's findings consistent with what he observed in counseling. Love testified that the Father's diagnosis of narcissistic personality is concerning because it reflects a lack of empathy and creates a potential for abuse.

12

Love testified that the Father made little to no progress relative to his domestic violence issues or his substance abuse issues. Love was of the opinion that the Father was noncompliant with his services. Love acknowledged that at times the Father became emotional while talking about his children and expressed his love for them.

The Father testified on his own behalf. He testified that he had a "turbulent relationship" with the Mother. According to the Father, the Mother has "[b]ipolar [disorder], PSD [sic], [and] schizophrenia." While the Father and the Mother were married, the Mother did not take medication to treat her conditions. The Father testified that he had only one physical altercation with the Mother.[3] He explained that he discovered the Mother was buying Adderall from someone in her apartment complex.[4] According to the Father, when he confronted the Mother about her pill use, she became physical and he had to restrain her to keep from getting "clawed up[.]" The Father was arrested for unlawful restraint and served thirty days in jail. The Father testified that after being released, he was subjected to a fifteen-day restraining order placed on him by the Mother. By the end of the restraining order,

---

[3]The Father later recalled an additional physical altercation with the Mother.

[4]Although the record does not indicate what Adderall is, we take judicial notice that it is an amphetamine generally used to treat attention deficit hyperactivity disorder.

13

sometime in the spring of 2013, the Father discovered the Mother and the children had been evicted from their apartment, and the Father could not find them. He testified he did everything he could to try to find G.R. and T.R., including at some point notifying CPS that his children might be in danger.

The Father disagreed with most of Dr. Stadler's conclusions. He denied that he was a narcissist and denied that he demonstrated histrionic characteristics. The Father also disagreed with Love's assessment that he was uncooperative with Love during counseling. The Father explained that he did not attend the boundaries class because those classes are meant for convicted sex offenders and he contends he did not belong in the class because he is not a convicted sex offender. Although he knew attending the class was a requirement of his service plan, the Father was concerned that attending the class would be an admission of guilt. The Father admitted that he did not complete his family plan of service.

The Father admitted that during the pendency of the case he used marijuana at least one time. He also admitted to spanking his children, but testified to using other forms of discipline as well. He admitted he did not attend the parent collaboration group. He also admitted that he did not participate in Dr. Quijano's sex offender treatment class. The Father admitted he did not take the ten-or thirteen-week course suggested in his plan, but explained those courses were not

feasible given his limited transportation options. Instead, the Father opted to take a four-hour parenting course from a church that he considered more accessible to him.

The Father told the court that in the four years immediately prior to trial, he had lived at seven or eight different places, which he agreed did not reflect stability. The Father admitted that he had not paid child support for either child during the pendency of the case. In his defense, the Father testified that he graduated from tech school in June of 2014 and received a two-year degree in electronic engineering. He now lives in a house and claims he has made a stable home for G.R. and T.R.

He admitted to using various drugs in the past including marijuana, methamphetamines, and LSD. The Father admitted that after taking a polygraph test concerning the allegation of sexual abuse, the polygrapher told him it did not look good for him. However, the Father continued to deny that he had sexually abused I.K. The Father testified that he complied with the family plan of service to the best of his ability given the time restrictions. He admitted that he "[m]ore or less" had a clear picture of the Department's expectations under the plan but still had some questions and concerns.

N.C. lives with the Father and is his fiancé. She testified that her two children (ages eleven and ten) reside with them. Because she is bipolar, she does not work outside the home but receives a SSI check. N.C. has also been diagnosed with severe depression. At the time of trial, N.C. was not under the care of a physician or taking medication for these conditions. She testified she and her children receive substantial counseling. She testified that the Father interacts with her children and helps them financially. In N.C.'s opinion, her children adore the Father, who helps with their homework, helps with chores around the house, and helps support them. N.C. testified that she has never seen the Father interact with her children inappropriately. The Father does not discipline her children and has never been physically violent with her or her children. Despite knowing that the Father failed his polygraph test, N.C. testified she does not believe the Father was inappropriate with I.K.

N.C. admitted she tested positive for marijuana use during the pendency of G.R. and T.R.'s case. She explained that she smokes marijuana as a form of self-medication for her depression. She smokes marijuana on stressful occasions when she is not taking medication. She testified that the Father told her he recently tested positive for marijuana use, but N.C. denied that she had ever seen the Father smoke

marijuana. She testified she believed she could provide G.R. and T.R with a good home.

Melody Clarke testified that she has counseled N.C. and her children for approximately three years. She noted that the Father attended counseling with N.C. and her children, as part of her family sessions during the year before trial. In the family sessions, she counseled the family on appropriate boundaries with children for stepparents. The children did not report any inappropriate behavior between the children and the Father. She observed the Father's interactions with N.C.'s children and found them to be appropriate. It was her opinion that the Father has been a good influence on N.C.'s children because he provides more structure, helps them communicate more effectively, and buys them things they need.

Clarke testified that she has also conducted individual counseling sessions with the Father. She explained that the Father was stressed out about the allegations of inappropriate sexual behavior and the resulting criminal investigation into those allegations. Clarke testified that based on what she observed in the Father, she does not believe the sexual assault allegations are true. She also testified that she has not seen signs of narcissistic behavior or histrionics in the Father.

After a bench trial, the trial court signed an order terminating the parental rights of the Father to T.R. and G.R. on November 17, 2014. The Father timely appealed the trial court's order.

**Grounds for Termination**

In his first, second, and third issues, the Father contends that the evidence is legally and factually insufficient to support the trial court's findings that he violated subsections (D), (E), and (O) of section 161.001(1) of the Texas Family Code. The trial court found that the Father (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical or emotional well-being of the children, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical or emotional well-being of the children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the Father to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent for abuse or neglect. For the reasons we discuss below, we conclude that the record contains clear and convincing evidence to support the trial court's finding that the Father failed to comply with the provisions of its order that specifically established the

18

actions necessary for the Father to obtain the return of G.R. and T.R. *See* Tex. Fam. Code Ann. § 161.001(1)(O).

The Father argues the Department's service plan failed to meet the basic requirements of section 263.102 of the Texas Family Code because the plan is vague and was not developed in conference with the Father. *See generally* Tex. Fam. Code Ann. § 263.102 (West 2014). We find nothing in the record demonstrating that the Father challenged the Department's compliance with section 263.102 in the trial court. Therefore, we find that the Father failed to preserve his complaint that the Department did not comply with section 263.102 of the Texas Family Code. *See* Tex. R. App. P. 33.1(a).

Section 161.001(1)(O) of the Texas Family Code provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(1)(O). "Subsection O may operate as a ground for termination when a parent from whom children are not physically removed fails to comply with court-ordered services." *In re K.S.*, No. 09-14-00222-CV, 2014 WL

19

4755500, at *5 (Tex. App.—Beaumont Sept. 25, 2014, pet. denied) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 532 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The Father argues the record contains no evidence that a court order was entered concerning the tasks the Father had to complete for return of his children. However, the clerk's record includes the trial court's temporary orders, which specifically ordered the Father to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The Father's service plan, admitted into evidence at trial, included, among other things, requirements that the Father: (1) attend and complete a parenting course offered by certain providers identified in the service plan; (2) submit to random drug testing at the Department's discretion; (3) participate in Dr. Quijano's sex offender awareness class and follow all recommendations; (4) participate in a parent collaboration support group once a month; (5) submit to psychological evaluation and follow all recommendations; and (6) actively participate in counseling and follow all recommendations of the therapist. We conclude the record on appeal contains the appropriate documents in relation to evaluating the trial court's termination under subsection (O). *See In re J.F.*, No. 11-14-00246-CV, 2015 WL 1135190, at *2 (Tex. App.—Eastland March 6, 2015, no pet. h.); *In re E.S.C.*, 287 S.W.3d 471, 474-75 (Tex. App.—Dallas 2009, pet. denied).

The CPS caseworker testified that she went over the service plan with the Father and he appeared to understand the plan's requirements. The Father also testified that he "[m]ore or less" had a clear picture of the Department's expectations under the plan. Love testified that he addressed various concerns the Father had about attending the sex offender classes with the Father. The Father explained how certain requirements were inconvenient for him to complete and that he should not be required to meet certain other requirements.

The evidence was undisputed, as detailed above, that the Father failed to complete the services that were required by his family service plan and ordered by the trial court. While the Father made a number of excuses for his failure to complete the services, section 161.001(1)(O) does not require the court to consider excuses for a parent's failure to comply with the court-ordered services. *See In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). The undisputed evidence also reflects that G.R. and T.R. were removed from their home due to abuse and neglect and that they had been in the care of the Department for well over nine months.

Viewing the evidence in the light most favorable to the trial court's finding under subsection 161.001(1)(O), we conclude that the trial court reasonably could have formed a firm belief or conviction that the Father failed to comply with the

provisions of a court order that specifically established the actions necessary for him to obtain the return of G.R. and T.R. *See* Tex. Fam. Code Ann. § 161.001(1)(O); *see also In re T.T.*, 228 S.W.3d 312, 319-20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (affirming termination where the mother failed to comply with four of the seven requirements and the father failed to comply with three of seven requirements); *In re C.D.B.*, 218 S.W.3d 308, 311-12 (Tex. App.— Dallas 2007, no pet.) (affirming termination based on the mother's partial compliance with service plan).

Based on our review of the entire record, we further conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction about the truth of the State's allegation that the Father failed to comply with court-ordered services. *See C.H.*, 89 S.W.3d at 25. We, therefore, conclude that the evidence was legally and factually sufficient to support the trial court's finding under section 161.001(1)(O). We overrule the Father's first, second, and third issues.[5]

---

[5]We need not address the sufficiency of the evidence to support a violation of subsections (1)(D), or (E). *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.— Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.").

## Best Interest of the Child

The trial court found that termination was in the children's best interest. In his fourth issue, the Father contends the evidence is legally and factually insufficient to support this finding.

Regarding the children's best interest, we consider a non-exhaustive list of factors: (1) desires of the children; (2) emotional and physical needs of the children now and in the future; (3) emotional and physical danger to the children now and in the future; (4) parental abilities of the individual seeking custody; (5) programs available to assist this individual to promote the best interest of the children; (6) plans for the children by this individual or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014). In reviewing the trial court's decision to terminate a parent's relationship with a child, we consider that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). The party seeking termination need not prove that each *Holley* factor favors termination. *C.H.*, 89 S.W.3d at 27. A trial court's best interest

finding "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm[,]" but rather it "is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

The Father argues that the record reflects that the children are bonded to him and that his visits with them are appropriate. However, the record does not support this contention. Rather, the record does not clearly reflect the children's desires. The only clear testimony regarding the children's reaction to the Father came from the children's foster mother who unequivocally testified that both G.R. and T.R. are afraid of the Father and that G.R. returns from visits fearful that the Father is going to come and take him away.

As explained above, the Father has a history of using illegal drugs. Both he and his fiancé admitted to testing positive for drug use during the pendency of this case. The evidence also supports that the Father failed to submit to one-half of the Department's requests for drug testing. There was also evidence at trial that the Father was physically abusive to the Mother, G.R., and T.R. G.R. indicated that he witnessed the Father throw the Mother down the stairs. According to the foster mother's testimony, initially both children were unaccustomed to the lack of fighting and hitting in their foster home.

Additionally, the Father failed to show adequate progress on his service plan. Specifically, the Father was asked to attend parenting classes, participate in a sex offender awareness class, participate in a parent collaboration support group once a month, and actively participate in family counseling. When the Father was asked to explain why he did not complete his services, he explained that it was either too difficult for him to complete the task required or he did not think he should have to do what was required. He made the decision not to complete the services even though his service plan was explained to him and he understood the requirements to get his children back. The Father's counselor testified that the Father did not successfully complete counseling because he was not cooperative.

The CPS caseworker for the children testified that G.R. and T.R. have special needs and both receive therapy. She testified that she is satisfied that the children's foster family is meeting their needs. The caseworker asked the court to name the Department as the permanent managing conservator. She explained the Department's goal is unrelated adoption with a concurrent goal of relative adoption.

The children's foster mother testified G.R. and T.R. lived with her for over six months and are doing very well. The foster mother testified that she and her

husband are willing to adopt G.R. and T.R., and she believes that is the best option for them.

The CASA advocate testified that G.R. and T.R. have flourished in their foster parents' home. She testified that the children have a nurturing bond with their foster mother and the rest of the siblings in the home. The CASA advocate testified that the children's foster mother has worked diligently with both children and that they are doing extremely well in school. She testified that the foster family is both financially and emotionally prepared for long-term placement of the children. The children are happy and content in their current placement.

Viewing the evidence in the light most favorable to the best interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination was in the best interest of G.R. and T.R. Based on our review of the entire record, we further conclude that the trial court could reasonably have formed a firm belief or conviction that it would be in the best interest of both children for the Father's parental rights to be terminated. The evidence is both legally and factually sufficient to support the best interest finding. We overrule the Father's fourth issue.

Having overruled all of the Father's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on March 17, 2015
Opinion Delivered May 14, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.